IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN MARIE R.,[1] )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>KILOLO KIJAKAZI, Acting )<br>Commissioner of Social Security,[2] )<br>)<br>    Defendant. ) | No. 20 C 2565<br><br>Magistrate Judge Gabriel A. Fuentes |

**ORDER**[3]

Before the Court is Plaintiff Susan Marie R.'s motion seeking remand of the Administrative Law Judge's ("ALJ") opinion denying Plaintiff's application for benefits based on the claim that Plaintiff became disabled on January 1, 2016, at 48 years old, due to multiple physical and mental impairments.[4] (D.E. 13.)

---

[1] The Court in this opinion is referring to Plaintiff's first name and first initial of Plaintiff's last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

[3] On May 6, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 5.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

I.  **Administrative Record**

In 2016, Plaintiff visited multiple doctors for complaints including severe headaches; numbness, tingling and pain in her left side extremities; pain in her lower back and feet; periods of confusion and "spacing out;" and depression and anxiety. Testing by her treating neurologist Christopher Kobet, M.D., showed abnormal balance, slowed finger movements on the left side and a normal gait. (R. 449-50.) Dr. Kobet diagnosed Plaintiff with somatoform disorder[5] and prescribed Topamax for migraines, the antidepressant Celexa and the antipsychotic Seroquel. (R. 453-57, 460-64.) Plaintiff's primary care physician ("PCP"), Mohammed Saleh, M.D., prescribed Plaintiff Lexapro for depression and tramadol (an opioid pain medication) and Flexeril (a muscle relaxant) for pain. (R. 370.) In April, Plaintiff had pain and reduced range of motion ("ROM") in her left arm and foot after her sister hit her with logs on the left side of her body. (R. 360-66.) Dr. Salah prescribed Mobic for pain and inflammation. (*Id*.; R. 372-73.) Plaintiff was also treated by psychiatrist David Franzblau, M.D. He opined that Plaintiff had dissociative disorder after observing that her thinking and dialogue were disorganized and disconnected;[6] Dr. Franzblau increased Plaintiff's dosage of Seroquel and added the anti-anxiety drug lorazepam. (R. 529-30, 533, 536.) At the end of 2016, Plaintiff met with a new PCP, Samantha Nuffer, M.D., and reported pain in the left hand and leg, both feet, lower back and abdomen. (R. 480, 485.)

In January 2017, Plaintiff reported right foot pain and right knee pain and numbness. Podiatrist Brian Buchanan, D.P.M., noted that Plaintiff had a bunion deformity and her foot was

---

[5] "Somatic symptom disorder is characterized by an extreme focus on physical symptoms . . . that causes major emotional distress and problems functioning." https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776.

[6] "Dissociative disorders . . . involve experiencing a disconnection and lack of continuity between thoughts, memories, surroundings, actions and identity." https://www.mayoclinic.org/diseases-conditions/dissociative-disorders/symptoms-causes/syc-20355215.

tender to palpation, but she had normal ROM. (R. 678-82.) Separately, orthopedist Jason Lazor, D.O., noted that Plaintiff had limited ROM and tenderness to palpation in the right knee, but full strength and normal gait. (R. 689-91.) In a function report that month, Plaintiff wrote that on good days, she took care of her personal hygiene and did about 45 minutes of daily chores including washing dishes, vacuuming, dusting, and doing the laundry; however, those activities did not get done when Plaintiff had migraines or her left arm was weak and painful. (R. 259-62.) Plaintiff enjoyed making jewelry, dancing and yoga but seldom did those things due to problems with balance, coordination, fatigue and using her left hand. (R. 262.) Plaintiff wrote that she drove a car and went shopping once or twice a week, but she sometimes froze or "zoned out" for hours, and she had a very hard time managing bills because she was so disorganized. (R. 261-63.)

In February and March 2017, Plaintiff continued to report right knee pain, migraines, left shoulder pain, and feeling disconnected at times. (R. 555.) Dr. Lazor opined that Plaintiff's knee pain was related to osteoarthritis and referred Plaintiff to physical therapy ("PT"). (R. 726.) From April through June, Plaintiff showed some improvement with PT, but she was discharged from PT later in June due to a plateau in recovery. (R. 694-700, 735, 757.) That month, Dr. Lazor observed that Plaintiff had pain and limited ROM in the lumbar spine, tenderness in the right knee, single leg stance instability due to weakness and decreased sensation in the right lower extremity, and pain at the right hip and thigh. (R. 733-35.)

In April 2017, Plaintiff underwent a psychological consultative exam by Robert Baird, Ph.D. Dr. Baird observed that Plaintiff sometimes "appeared to disconnect" from the conversation, staring off into space with her mouth moving but not articulating, and at one point Plaintiff's speech became "rather incoherent." (R. 540-42.) Examination showed Plaintiff's mental activity was slowed, her emotional reaction was depressed and anxious, and Plaintiff had some issues with

3

memory, but she was fully oriented. (R. 542-43.) Dr. Baird wrote that "[t]here is concern the claimant may have been attempting to exaggerate some of her experiences;" he opined that Plaintiff's prognosis was "poor." (R. 542-44.) Later that month, a non-examining state agency psychologist opined that Plaintiff had severe migraines and somatic symptom disorder, but she had only mild limitation in understanding, remembering or applying information, interacting with others, and adapting or managing oneself, and moderate limitation in concentrating, persisting or maintaining pace. (R. 94-95.) The non-examining state agency physician opined that Plaintiff had the residual functional capacity ("RFC") to perform medium work, including standing, walking and sitting six hours in an eight-hour workday. (R. 97.)

Plaintiff continued to complain of a host of physical impairments in 2017 and 2018. In July 2017, Plaintiff had pain and weakness in her right arm and shoulder as well as lumbar pain radiating down the right leg; imaging showed a tear in Plaintiff's right shoulder, for which she received a cortisone shot and was prescribed tramadol. (R. 578, 748-49.) In September 2017, Dr. Nuffer opined that Plaintiff's pain was related to nerve damage and prescribed gabapentin. (R. 582-85.) Plaintiff also continued to report migraines, for which Dr. Kobet prescribed Topamax, Imitrex and Motrin. (R. 804-08, 819.) In June 2018, Plaintiff sought treatment for swelling and pain in her arms and hands after falling when trying to move a drier on a dolly; she was prescribed 800 mg of ibuprofen and tramadol for the pain. (R. 764, 768.) In addition, in August 2018, Plaintiff sought treatment for pain, weakness and decreased ROM in the right foot and ankle; Dr. Buchanan opined the pain was related to nerve compression or issues with Plaintiff's lower back. (R. 778.)

With regard to her mental health, Plaintiff returned to Dr. Franzblau in June 2017; he "emphatically" told Plaintiff she "need[ed] to consider working, at least part-time. Otherwise, she will have little say over her course and few ways to strengthen her identity." (R. 611.) In May

2018, Plaintiff told Dr. Franzblau that she was still having dissociative episodes; examination showed Plaintiff had a reactive affect and halting thought processes. (R. 512.) In August, Dr. Franzblau observed that Plaintiff's mood was deflated, and she was anxious and tearful. (R. 614.) In addition to lorazepam, Seroquel and tramadol, Dr. Franzblau added a prescription for duloxetine for depression and anxiety. (*Id.*) Dr. Franzblau told Plaintiff that she was "bright, capable of analysis and [could] be productive" and encouraged Plaintiff to get a part-time job. (*Id.*)

## II. December 11, 2018 Hearing.

An independent medical expert, Nancy Winfrey, Ph.D., testified that the record showed Plaintiff had unspecified depressive disorder and personality disorder and generalized anxiety disorder and opined that Plaintiff had mild limitation in understanding, remembering or acquiring information, and moderate limitations in the other paragraph B areas, such that Plaintiff could perform low-stress jobs with simple, routine and repetitive instructions and tasks, no fast-paced production, no teamwork/tandem work and only superficial contact with the public. (R. 43-47.)

Plaintiff testified that her physical impairments included loss of sensation and pain in her right toes that led to falls (R. 49-50), pain in her right knee that made it hard for her to do household tasks requiring kneeling or bending (R. 52-54), low back pain that moved down her right leg which interfered with vacuuming, sweeping and putting on socks/shoes (R. 57-58), and a tear in the right shoulder that made it hard to lift. (R. 59-60.) Plaintiff also had migraines twice a week, some of which lasted three to seven hours. (R. 64-67.) Plaintiff testified that she became disorganized, disoriented and zoned out sometimes, and had trouble keeping up with bills and following directions to cook (although she helped out a little with chores), needed to use GPS when driving, and sometimes needed to sit down when shopping. (R. 54-56, 70-73.) Some days Plaintiff was in

too much pain to drive. (R. 70.) Plaintiff also testified that she was recently harassed by a neighbor and so was anxious and fearful about going outside. (*Id.*)

The ALJ described to the vocational expert ("VE") a hypothetical person limited to light work with the following limitations: occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, and operate foot controls; avoid work at unprotected heights or around hazardous machinery, concentrated exposure to vibration, and driving commercially; only simple, routine, repetitive tasks and instructions; no work with the general public; occasional interaction with co-workers and supervisors (no tandem work); variable rate, not fast-paced production or assembly line work; no strict hourly production requirements; occasional decision-making; and occasional changes in the work setting. (R. 81-82.) The VE testified that Plaintiff's past work was eliminated because it was semi-skilled or skilled, but other jobs would be available. (R. 82-83.) No work was available for someone off-task more than 15 percent of workday, absent more than once a month, or needing close supervision and multiple reminders each day. (R. 84-86.)

### III. February 27, 2019 ALJ Opinion

The ALJ's opinion focused primarily on Plaintiff's mental impairments. The ALJ determined that Plaintiff had the severe impairments of generalized anxiety disorder, depressive disorder, and personality disorder but that Plaintiff's dissociative identity disorder was not severe, and that Plaintiff's impairments did not meet or medically equal the severity of any mental disorder under Listing 12.00 because the paragraph B criteria were not met. (R. 17-20.) The ALJ agreed with Dr. Winfrey, whose opinion the ALJ gave great weight, that Plaintiff had mild limitation in understanding, remembering, or applying information and moderate limitation in the other paragraph B areas. (R. 18, 23-24, 27.) In support of not finding Plaintiff more limited, the ALJ reiterated that the psychological consultative examiner thought Plaintiff may have been

6

exaggerating her symptoms. (R. 18-20.) In addition, the ALJ noted that Plaintiff's mental status exams in January 2016 and September 2017 were normal, and Plaintiff was able to drive, shop, do yoga and spend time with friends. (*Id*.) The ALJ also noted that despite "increased symptomology" in May 2018, Plaintiff had a normal psychiatric exam in August 2018, and Dr. Franzblau told Plaintiff she was bright and encouraged her to seek a part-time job. (R. 22-23.)

After explaining the basis for the mental limitations in the RFC (which were the same as those the ALJ gave in the hypothetical to the VE at the hearing) (R. 20-24), the ALJ addressed Plaintiff's alleged back pain, right foot pain, right knee pain, problems with bending, balancing and lifting, right shoulder pain, left-sided pain, and migraines. (R. 24.) First, the ALJ found that Plaintiff's right foot pain was adequately addressed by limiting Plaintiff to occasional operation of foot controls and no commercial driving or concentrated exposure to lower vibration, because the ROM in her foot was normal. (R. 24.) Second, the ALJ concluded that despite being assessed with patellofemoral pain syndrome/IT band syndrome in the right knee[7] and imaging showed near full-thickness cartilage fissuring, the evidence showed "generally normal findings and improvement," such that Plaintiff's right knee issues were adequately accommodated in the RFC with postural limitations and the limits related to Plaintiff's right foot. (R. 24-25.) Third, the ALJ determined that Plaintiff's allegations of problems walking, standing and balancing were "not consistent with the objective findings" because Plaintiff had normal gait and full strength in her lower extremities. (R. 25.) The ALJ also found these allegations were "inconsistent with her activities that require balancing such as dancing, exercising, and moving a dryer using a dolly." (*Id*.) Fourth, the ALJ found that Plaintiff's shoulder pain was adequately addressed with the RFC's limit to lifting 20

---

[7] Patellofemoral pain syndrome refers to pain at the front of the knee, and IT (iliotibial) band syndrome is where the iliotibial tendon gets irritated or swollen from rubbing against the hip or knee bones.

pounds occasionally and 10 pounds frequently because Plaintiff had mostly full strength in her right arm, and she "mov[ed] a dryer on a dolly," which was "inconsistent with her allegation of significant right extremity limitations." (R. 25-26.) Fifth, the ALJ found "no significant findings" with regard to Plaintiff's alleged "left-sided pain" because x-rays were essentially normal, and Plaintiff exhibited normal gait and motor strength. (R. 26.) Sixth, the ALJ determined that Plaintiff's "migraines support prohibiting [her from] work at unprotected heights or around hazardous machinery," but that "the frequency or severity" of her migraines do not warrant greater restrictions. (*Id.*) At that point, the ALJ concluded that Plaintiff did not have a severe physical impairment and purported to give Plaintiff's allegations of physical limitations "the benefit of the doubt" by limiting her to a limited range of light work. (*Id.*) Ultimately, the ALJ determined that Plaintiff could not perform her past work but could make a successful adjustment to other work that existed in significant numbers in the national economy. (R. 29.)

IV.  **Analysis**

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022). "But even under this deferential standard of review, an ALJ must provide a logical bridge between the evidence and her conclusions." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (internal quotations omitted). Plaintiff argues that the ALJ failed to adequately evaluate her physical RFC, including

failing to properly evaluate her use of medication and her daily activities. (D.E. 14: Pl.'s Br. at 2-10, 14-15.)[8] For the following reasons, the Court agrees.

### A. The Physical RFC Determination Was Not Supported By Substantial Evidence.

As we noted above, most of the ALJ's opinion was devoted to Plaintiff's mental impairments, but the focus of our concern on review is the ALJ's physical RFC determination. Here, the ALJ assigned Plaintiff the RFC "to perform a range of light work as defined in 20 CFR 404.1567(b)," with the following additional physical limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl; never work at unprotected heights or around hazardous machinery; never perform commercial driving; occasionally operate bilateral foot controls; and avoid concentrated exposure to lower vibration. (R. 20.) This RFC determination presumes Plaintiff would be on her feet up to two-thirds of a workday, standing or walking off and on for approximately six hours of an eight-hour workday, while frequently lifting or carrying objects weighing up to 10 pounds. *See id*. and SSR 83-10.

In determining a claimant's RFC, the ALJ must consider "the totality of a claimant's limitations," "consider[ing] all of the relevant evidence in the record, even limitations that are not severe," and "buil[d] an accurate and logical bridge from the evidence to her conclusion." *Jarnutowski*, 48 F.4th at 774. To withstand appellate review in the district court, the ALJ's "RFC analysis must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Id*. at 773. Otherwise, the ALJ's decision cannot be affirmed as supported

---

[8] Plaintiff's additional argument, that the ALJ should have addressed all of the VE's testimony that was "favorable" to her, misunderstands the purpose of VE testimony. The VE's testimony is relevant only insofar as the ALJ adopts the limitations upon which it is based. *See, e.g.*, *Reynolds*, 25 F.4th at 473.

by "substantial evidence." *Id*. at 773-74. Relatedly, the Seventh Circuit often has stated that in determining the RFC, the ALJ may not "cherry-pick" evidence from the record — "highlighting facts that support a finding of non-disability while ignoring evidence to the contrary." *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020). An RFC determination that ignores or skips over contrary evidence pointing in a claimant's favor does not permit this Court to review that determination meaningfully and does not set forth a "logical bridge" between the ALJ's conclusions and the evidence, meaning that the ALJ's conclusions are not supported by substantial evidence.

Here, however, the ALJ's determination that Plaintiff was capable of light work did not account for or explain significant evidence to the contrary as to Plaintiff's physical limitations. With regard to Plaintiff's right knee, the ALJ stated that additional limitations in the RFC were not warranted "[g]iven the generally normal findings and improvement in the record . . . ." (R. 25.) Although the ALJ did note one sign of improvement in Plaintiff's knee pain and strength after PT, the ALJ ignored Dr. Lazor's examination that same month, showing Plaintiff's stance was unstable due to weakness, pain and decreased sensation in her right leg. (R. 733-35.) Dr. Lazor's examination result thus indicated that whatever improvement the ALJ relied upon was, at best, short-lived, and insufficient to sustain a conclusion that Plaintiff's patellar function was "normal" or experiencing improvement that was approaching normal. In the meantime, the ALJ noted that the record included evidence of abnormal findings, not normal ones, such as Plaintiff's diagnosis of patellofemoral pain syndrome/IT band syndrome, an MRI showing near full-thickness cartilage fissuring, discharge from PT due to a plateau in recovery, and later evidence of continued right leg weakness. (R. 24-25.) But the ALJ did not take the logical next step of explaining how the RFC determination could be squared with such abnormal findings. This was error, as the ALJ may not "consider[] only the signs of possible improvement . . . and ignore[] the negative findings."

10

*Gerstner v. Berryhill*, 879 F.3d 257, 261-62 (7th Cir. 2018). This Court therefore is unable to review whether the ALJ considered the totality of Plaintiff's limitations and is unable to confirm that the RFC determination is supported by substantial evidence. We do not reweigh evidence supporting or contradicting the ALJ's conclusion that Plaintiff's knee was normal and improved, but we cannot affirm the ALJ's decision (that Plaintiff could perform light work) as supported by substantial evidence because the ALJ does not appear to have weighed this contrary swath of record evidence at all.

In addition, the ALJ's determination that Plaintiff's allegations of pain in her right foot, shoulder, left side and head were not consistent with the objective evidence was not supported by substantial evidence. The ALJ appeared to doubt Plaintiff's complaints of pain because Plaintiff often displayed normal gait, strength and ROM, but the ALJ ignored that Plaintiff's doctors – including the orthopedist, podiatrist, neurologist and PCP – did not share the ALJ's doubts, as they continued to treat Plaintiff's pain with strong medications, including tramadol (an opioid pain medication), Flexeril (a muscle relaxant), Mobic (a nonsteroidal anti-inflammatory medication used to treat pain and inflammation in osteoarthritis), nerve pain medication and steroid injections over the course of several years. The ALJ's decision to reject Plaintiff's allegations that she was physically limited due to pain was not supported by substantial evidence because it ignored this evidence that Plaintiff's doctors consistently continued to try to treat her pain, and with substantial pharmacological intervention. *See Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (remanding, in part, because the ALJ "did not address the fact that [the claimant's] allegations of pain were consistent with the strong prescription pain medication he was taking.")

Moreover, there is a significant disconnect between the evidence and the ALJ's determination that Plaintiff's "activities" of dancing, exercising, and moving a dryer using a

11

dolly demonstrated that she could balance, walk and stand. The record contains no evidence that Plaintiff attempted to move a dryer using a dolly more than once, and on that occasion, the evidence was that she lost her balance, injuring herself after she slipped and fell. (R. 764.) Furthermore, although Plaintiff listed her hobbies and interests as including "making jewelry, dancing, stretching/yoga," she answered the question of "how often and how well do you do these things" as "not much – haven't made jewelry in well over a year, dancing & stretching – only in house – limited – balance – fatigue – injuries. . . . coordination & strength not there for dance & yoga – balance." (R. 262.) The ALJ, on the other hand, treated the record as if it showed that Plaintiff regularly availed herself of recreational activities – dancing and yoga – that demanded physical exertion and agility. But Plaintiff never said this was the case, and although her statement that she performed these activities less often because of her physical impairments may have lacked crystal clarity, this statement cut against, and not in favor of (as the ALJ appears to have believed), the RFC determination. On appellate review directed at whether the RFC determination considered the totality of Plaintiff's limitations, the Court cannot find that the ALJ's reliance on Plaintiff's supposed dancing and yoga activities survives substantial evidence review. Because the ALJ failed to acknowledge these limitations in Plaintiff's activities or conflated Plaintiff's statements into an admission that Plaintiff regularly engaged in substantially challenging physical activities, the ALJ's conclusions that Plaintiff's activities showed she had no problem balancing, walking and standing was not supported by substantial evidence. *See Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (reversing and remanding where the ALJ ignored the claimant's testimony about the pain and fatigue his daily activities cause him and his limitations with them).

**B. Dr. Baird's and Dr. Franzblau's Reports Do Not Support the ALJ's Physical RFC Determination.**

The ALJ's reliance on the reports of Drs. Baird and Franzblau did not rescue the overall RFC determination, because those reports addressed Plaintiff's alleged mental impairments and did not speak to the physical impairments that cut against the RFC determination. As noted above, the ALJ emphasized Dr. Baird's suggestion that Plaintiff "may have been attempting to exaggerate some of her experiences" during her psychological consultative exam and Dr. Franzblau's encouragement to Plaintiff to try working part-time during the course of a psychiatric session. Superficially, these notes might have had great appeal to a finding of no disability, but they were completely disconnected from the evidence of Plaintiff's physical limitations and the ALJ's consideration of Plaintiff's physical impairments. In fact, the ALJ considered only Plaintiff's mental impairments in steps one through three of the five-step sequential process for determining disability,[9] and the ALJ never connected her conclusions as to Plaintiff's physical impairments with her discussion of Plaintiff's mental impairments.

Moreover, the Court cannot glean from the ALJ's opinion what the emphasis on these notes in Dr. Baird's and Dr. Franzblau's reports says about Plaintiff's overall credibility because the ALJ ignored the portions of these reports that were consistent with Plaintiff's claimed impairments. For example, the ALJ failed to discuss the results of Dr. Baird's exam showing slowed mental activity and memory problems and Dr. Baird's conclusion that Plaintiff's prognosis was "poor," and the ALJ ignored that Dr. Franzblau continued to prescribe Plaintiff mood

---

[9] "The regulations set out a 5-step sequential inquiry to determine disability status. The ALJ must decide (1) whether the claimant is currently employed; (2) whether she has a severe impairment or a combination of impairments that is severe; (3) whether her impairments meet or equal any impairments listed as conclusively disabling; (4) whether she can perform her past work; and (5) whether she is capable of performing any work in the national economy." *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021) (citing 20 C.F.R. § 404.1520(a)-(g)).

13

stabilizers and antidepressants in various doses to treat her mental health symptoms. In addition, Dr. Franzblau's words of encouragement to Plaintiff said nothing about what type of work he thought Plaintiff might be able to perform part-time, much less the physical demands of full-time light work. In sum, the statements by Drs. Baird and Franzblau fall short, on this record, of establishing substantial evidence in support of the ALJ's RFC determination.

## CONCLUSION

For these reasons, the ALJ's determination as to Plaintiff's RFC was not supported by substantial evidence. Accordingly, the Court grants Plaintiff's motion to remand (D.E. 13) and remands the case for further proceedings consistent with this opinion.

**ENTER:**

                          **GABRIEL A. FUENTES**
                          **United States Magistrate Judge**

**DATED: February 14, 2023**